# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

ANGELO BINNO,

       Plaintiff,

   v.

LAW SCHOOL ADMISSION COUNCIL, INC.,

       Defendant.

_____/

**COMPLAINT**

Case. No._____

Hon._____

Magistrate_____

## PRELIMINARY STATEMENT

Plaintiff, an aspiring law student who is legally and almost totally blind, brings this civil rights lawsuit against Defendant, the corporation that writes, administers, and scores the Law School Admission Test ("LSAT"). The LSAT discriminates against blind test-takers: its Analytical Reasoning section requires test-takers to draw and use diagrams to answer many of its questions, placing blind test-takers at a substantial competitive disadvantage. Plaintiff challenges Defendant's refusal to exempt him from the LSAT's Analytical Reasoning section. Plaintiff brings this action pursuant to Titles III and V of the Americans with Disabilities Act ("ADA"), *see* 42 U.S.C. §§ 12189 & 12203(b), and pursuant to the Michigan Persons with Disabilities Civil Rights Act, *see* M.C.L. §§ 37.1102 &

37.1302. Plaintiff seeks declaratory and injunctive relief on his own behalf and on behalf of other similarly situated individuals.[1]

## JURISDICTION AND VENUE

1.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction over all civil actions arising under laws of the United States, and pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over actions to secure civil rights extended by the United States government.

2.     This Court is authorized to award the relief requested pursuant to 28 U.S.C. §§ 1343, 2201, and 2202, and pursuant to 42 U.S.C. §§ 12188 and 12203.

3.     This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367, as that claim arises from the same set of operative facts as Plaintiff's federal claims.

---

[1] Pursuant to Local Rule 83.11(b)(7), Plaintiff respectfully requests that this case be considered a companion case to *Binno v. American Bar Association*, Docket # 2:11-cv-12247 (E.D. Mich.). In that case, Plaintiff alleged that the American Bar Association ("ABA") was violating Titles III and V of the ADA by requiring law schools to insist that all applicants take the LSAT, a test that Plaintiff alleged discriminates against blind individuals. *See id.* at D/E 15. That lawsuit was dismissed for failure to state a claim against the ABA. *See Binno v. American Bar Ass'n*, 2012 WL 4513617 (E.D. Mich. Sept. 30, 2012), *aff'd* 826 F.3d 338 (6th Cir. 2016), *cert. denied* 2017 WL 1114974 (U.S. Mar. 27, 2017). In affirming the District Court's decision, however, the Sixth Circuit suggested that Plaintiff had sued the wrong party, and that the proper party-defendant is the Defendant in this action. *See Binno*, 826 F.3d at 345-48.

4.  Venue is proper in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events that gave rise to this complaint occurred in this district.

## PARTIES

### **Plaintiff**

5.  Plaintiff Angelo Binno is a 34-year-old man who lives in an apartment in West Bloomfield, Michigan. West Bloomfield is located in this judicial district.

6.  Mr. Binno has an inherited, congenital, degenerative eye disorder that affects the retina.

7.  In the United States, an individual is considered legally blind if his or her visual acuity in the better eye cannot be corrected to better than 20/200, or if his or her field of vision in the better eye is 20 degrees or less.

8.  Mr. Binno is legally blind. His field of vision in each eye is restricted to less than five degrees. His best corrected visual acuity within that narrow field of vision is 20/150 in his right eye and 20/200 in his left eye.

9.  Total blindness is the complete lack of light perception and form perception.

10. Mr. Binno is almost totally blind.

11. Nystagmus is a condition in which the eyes move rapidly and uncontrollably. Nystagmus causes vision to be blurred.

12.     Mr. Binno has nystagmus in both eyes.

13.     Mr. Binno is unable to either draw or use diagrams because of his vision impairment.

14.     Despite being legally and almost totally blind and having nystagmus, Mr. Binno graduated from high school in just three years while working part-time.

15.     After graduating from high school, Mr. Binno earned a bachelor's degree in political science from Wayne State University in Detroit, Michigan.

16.     Mr. Binno requested a waiver from Wayne State University's math requirement because math courses at the University require students to draw and use diagrams. Mr. Binno's request was granted.

17.     After graduating from college, Mr. Binno worked for the United States Department of Homeland Security, where he was granted a high-level security clearance and awarded a certificate of appreciation for his work.

18.     Mr. Binno speaks three languages fluently: English, Arabic, and Chaldean. He has provided translation services to refugees and immigrants seeking United States citizenship.

**Defendant**

19.     Defendant Law School Admission Council, Inc. ("LSAC") is a private corporation organized and existing under the laws of the State of Delaware, and headquartered in Newtown, Pennsylvania.

20.     LSAC has more than 200 member schools. All law schools accredited by the American Bar Association ("ABA") are LSAC members, including all five law schools in the State of Michigan.

21.     LSAC designs, writes, prepares, offers, administers, and scores the LSAT, a standardized test used for law school admission purposes, and reports LSAT scores to law schools.

22.     LSAC is exclusively and entirely in control of the content of the LSAT, and where and in what manner it is administered.

23.     LSAC administers the LSAT four times a year, usually in February, June, September, and December.

24.     LSAC administers the LSAT throughout the United States, including multiple locations within this judicial district.

25.     LSAC regulates the materials that test-takers may and must bring with them to locations where the LSAT is administered.

26.     LSAC requires each individual who wishes to take the LSAT to pay a $180 registration fee directly to LSAC.

27.      Test-takers must pay LSAC an additional $30 per report to send their LSAT scores to individual law schools.

28.     LSAC is the sole entity that determines whether accommodations will be granted to individuals with disabilities who register to take the LSAT.

## STATEMENT OF FACTS

### The LSAT

29.     The LSAT is an integral part of the law school admission process in the United States.

30.     The LSAT consists of five sections of multiple-choice questions, plus an unscored writing sample.

31.     Only four of the five multiple-choice sections contribute to the test-taker's LSAT score. In aggregate, those four sections include about 100 questions.

32.     The Analytical Reasoning section is one of the four multiple-choice sections that contribute to a test-taker's LSAT score.

33.     LSAC has published the June 2007 LSAT on its website. *See* http://www.lsac.org/docs/default-source/jd-docs/sampleptjune.pdf (last visited May 4, 2017). For illustrative purposes, the Analytical Reasoning section from the June 2007 LSAT is attached as Exhibit A.

34.     The LSAT's Analytical Reasoning section typically consists of 23-24 questions, about one-quarter of the questions that contribute to a test-taker's score.

35.     LSAC gives most test-takers 35 minutes to complete the Analytical Reasoning section, about 90 seconds per question.

36.     The LSAT's Analytical Reasoning section typically includes four discrete question sets, commonly referred to as Logic Games. The number of questions per Logic Game varies from five to eight.

37.     Each LSAT Logic Game includes a paragraph that sets forth the game's setting, identifies its variables (usually people, places, things, or events), and describes generally how those variables relate to one another. A typical Logic Game involves three to five variables.

38.     Each LSAT Logic Game includes a series of rules that impose restrictions on the relationships among its variables. A typical Logic Game includes four to six rules.

39.     The questions in each LSAT Logic Game require test-takers to reason deductively from its rules.

40.     Since December 1992 or earlier, the instructions at the beginning of the LSAT's Analytical Reasoning section have stated that "it may be useful to draw a rough diagram" to answer some of the questions.

41.     LSAC's website states that "it may prove very helpful to draw a diagram to assist you in finding the solution" to LSAT Analytical Reasoning questions. *See* http://www.lsac.org/jd/lsat/prep/analytical-reasoning (last visited May 4, 2017).

42.     LSAC has published two LSAT preparation books: *The Official LSAT SuperPrep* (2007) and *The Official LSAT SuperPrep II* (2015). Each book includes the following statement about Analytical Reasoning questions:

> It might be possible for some people to figure out the answers to individual questions in their heads. Generally, however, this requires enormous powers of concentration and creates opportunities for error. For most people, trying to work these problems in their heads would be an extremely bad idea. Virtually everyone is well advised to use pencil and paper in solving analytical reasoning questions.

*See The Official LSAT SuperPrep* at 5; *The Official LSAT Superprep II* at 5.

43.     Drawing a diagram helps test-takers see at one time how an LSAT Logic Game's variables relate to one another, and how they are impacted by the game's rules.

44.     Drawing a diagram helps test-takers make logical deductions about the relationships between an LSAT Logic Game's variables, both directly from the game's rules and indirectly from previous deductions made in the same game.

45.     The ability to draw and use diagrams is essential to answer many LSAT Analytical Reasoning questions, and extremely helpful in answering others.

46.     Individuals who are unable to draw and use diagrams are at a substantial competitive disadvantage in answering LSAT Analytical Reasoning questions.

47.     LSAC designed the LSAT's Analytical Reasoning section to assess test-takers' deductive reasoning skills and help predict their success in law school.

48.     LSAC did not design the LSAT's Analytical Reasoning section to assess test-takers' ability to draw and use diagrams.

49.     The ability to draw and use diagrams is not essential to success in law school. In fact, the ability to draw and use diagrams is of limited use in law school.

50.     LSAC scores the LSAT on a scale that ranges from 120 to 180, with 120 being the lowest possible score and 180 the highest possible score.

51.     Small variations in the number of correct answers can have a significant impact on a test-taker's LSAT score.

52.     Just about every law school in the United States requires all applicants for admission to take the LSAT.

53.      LSAT scores play a major role in admission decisions at most law schools in the United States. Small variations in LSAT scores can make the difference between receiving an offer of admission or a letter of denial.

54.     LSAT scores play a major role in scholarship decisions at many law schools in the United States. Small variations in LSAT scores can make the difference between being offered a full-ride scholarship, a partial scholarship, or no scholarship at all.

55.     LSAC has used the current form of the LSAT since the early 1990s.

56.     The Council and Accreditation Committee of the ABA Section on Legal Education and Admissions to the Bar accredit programs that lead to the J.D.

degree. In most states, individuals cannot take the bar examination without having attended an ABA-accredited law school. Since passing the bar is a requirement to practice law in most states, obtaining and retaining ABA-accreditation is of great importance to law schools in recruiting students.

57.    Until 1997, the ABA Standards for Approval of Law Schools allowed law schools to waive the LSAT as an admission requirement for applicants who were "physically incapable" of taking the test. The ABA Standards for Approval of Law Schools no longer allow law schools to do so.

58.    Until 1997, LSAC encouraged blind individuals to ask law schools to waive the LSAT as an admission requirement.

59.    For example, in 1995, LSAC sent now-Justice Richard Bernstein of the Michigan Supreme Court, a blind individual, a letter encouraging him to ask law schools to waive the LSAT as an admission requirement. A copy of LSAC's letter to Justice Bernstein is attached as Exhibit B.

60.    LSAC knows that the ability to draw and use diagrams is very helpful in finding the solution to Analytical Reasoning questions.

61.    LSAC knows that test-takers who are unable to draw and use diagrams are at a substantial competitive disadvantage in answering Analytical Reasoning questions.

62.     LSAC knows that small variations in the number of correct answers can have a significant impact on a test-taker's LSAT score.

63.     LSAC knows that LSAT scores play a major role in admission decisions at most law schools in the United States, and that small variations in LSAT scores can make the difference between receiving an offer of admission or a letter of denial.

64.     LSAC knows that LSAT scores play a major role in scholarship decisions at many law schools in the United States, and that small variations in LSAT scores can make the difference between being offered a full-ride scholarship, a partial scholarship, or no scholarship at all.

## Mr. Binno's Interactions with LSAC

65.     Mr. Binno has dreamed of attending law school and becoming a lawyer since childhood.

66.     Mr. Binno previously has taken the LSAT two times.

67.     On both occasions, LSAC gave Mr. Binno extra time as an accommodation on each of the LSAT's multiple-choice sections and on the writing sample, and provided a reader/scribe to read the LSAT's text and questions to Mr. Binno and record his answers on the LSAT's answer sheet.

68.     On one of those occasions, the individual LSAC provided to assist Mr. Binno as a reader/scribe informed Mr. Binno that he was not allowed to assist

11

Mr. Binno by drawing diagrams or reading diagrams that Mr. Binno himself might draw.

69.    On both occasions, Mr. Binno attempted to answer the questions in the Analytical Reasoning section, but was forced to guess the answers to most of the questions because of his inability to draw and use diagrams.

70.    On both occasions, Mr. Binno's LSAT score was significantly adversely affected by his inability to draw and use diagrams to answer Analytical Reasoning questions.

71.    On both occasions, Mr. Binno's performance on other sections of the LSAT was adversely affected by fatigue and stress resulting from attempting to answer Analytical Reasoning questions without being able to draw and use diagrams.

72.    In July 2016, Mr. Binno registered to take the December 2016 administration of the LSAT. Mr. Binno registered via telephone from his apartment in West Bloomfield, Michigan. Mr. Binno requested that he be assigned to take the LSAT at LSAC's Wayne State University testing center in Detroit, Michigan.

73.    In August 2016, Mr. Binno sent LSAC a written request for accommodations on the December 2016 LSAT. The request was supported by a report from a board-certified ophthalmologist and eye examination records from

the University of Michigan Health System. Mr. Binno sent the request via email from his apartment in West Bloomfield, Michigan.

74.     Mr. Binno asked LSAC to give him 50 percent extra time on each of the LSAT's multiple choice sections and on the writing sample, to allow him to use a computer for the writing sample, and to provide a reader/scribe to read the LSAT's text and questions to Mr. Binno and record his answers on the LSAT's answer sheet.

75.     In addition, Mr. Binno asked LSAC to modify the LSAT by exempting him from the test's Analytical Reasoning section.

76.     LSAC initially responded to Mr. Binno's request for accommodations in an email message dated August 31, 2016.

77.     LSAC agreed to give Mr. Binno 50 percent extra time on each of the LSAT's multiple choice sections and on the writing sample, to allow Mr. Binno to use a computer for the writing sample, and to provide a reader/scribe to read the LSAT's text and questions to Mr. Binno and record his answers on the LSAT's answer sheet.

78.     However, LSAC stated that it needed more time to consider Mr. Binno's request that he be exempted from the LSAT's Analytical Reasoning section.

79.     LSAC ultimately responded to Mr. Binno's request that he be exempted from the LSAT's Analytical Reasoning section in a letter dated October 12, 2016.

80.     LSAC refused to exempt Mr. Binno from the LSAT's Analytical Reasoning section.

81.     Instead, LSAC offered to give Mr. Binno 150% extra time on each section of the LSAT, including the Analytical Reasoning section, and to allow Mr. Binno to take the LSAT over two days with extra rest breaks.

82.     In addition, LSAC offered to consider making additional accommodations for Mr. Binno for the Analytical Reasoning section, such as allowing Mr. Binno to use a Microsoft Excel spreadsheet, computer-based administration with screen-reading software, a tactile system (e.g. a rubber graph board with tactile letters or pictures, or a magnetic board with magnetic letters or objects), or a braille writer or braille display.

83.     None of the accommodations that LSAC offered or offered to consider would be effective for Mr. Binno.

84.     Even with 150% extra time, Mr. Binno would have less than four minutes per question to complete the LSAT's Analytical Reasoning section. No reasonable amount of extra time would be sufficient to erase the substantial

competitive disadvantage created by the need to draw and use diagrams to answer Analytical Reasoning questions.

85. Allowing Mr. Binno to take the LSAT over two days, with extra rest breaks, would do nothing to erase the substantial competitive disadvantage created by the need to draw and use diagrams to answer Analytical Reasoning questions.

86. Allowing Mr. Binno to use a Microsoft Excel spreadsheet would not be effective because Mr. Binno's extremely narrow field of vision would limit him to viewing just one cell of the spreadsheet at a time. Drawing a diagram allows test-takers to see the forest and the trees at the same time; use of a Microsoft Excel spreadsheet only would allow Mr. Binno to see one tree at a time.

87. Allowing Mr. Binno to use a computer with screen-reading software or a tactile system would be ineffective for the same reason. Either approach would allow Mr. Binno to access just one piece of information at a time.

88. Allowing Mr. Binno to use a braille writer or braille display would be ineffective because Mr. Binno has not read braille since he was in middle school, about twenty years ago.

89. Exempting Mr. Binno from the LSAT's Analytical Reasoning section would not fundamentally alter the test. Mr. Binno still could take all of the other sections of the LSAT. Those sections include about three-quarters of the questions that contribute to a test-taker's LSAT score, plus the unscored writing sample.

15

LSAC could report Mr. Binno's raw score and percentile rank on each of the other scored sections of the test to law schools, and could transmit Mr. Binno's unscored writing sample to law schools in the same manner it does for all other test-takers. No other test-taker's performance or score would be adversely affected by exempting Mr. Binno from the LSAT's Analytical Reasoning section.

90.     Exempting Mr. Binno from the LSAT's Analytical Reasoning section would not impose an undue hardship on LSAC. Administering the LSAT to Mr. Binno without the Analytical Reasoning section would require less of LSAC's resources, not more. Reporting Mr. Binno's LSAT results in the manner described in the preceding paragraph would cause at most minimal inconvenience to LSAC.

## FIRST CLAIM FOR RELIEF

91.     Mr. Binno incorporates paragraphs 1 through 90 into this claim for relief.

92.     Title III of the ADA requires any person that offers an examination related to applications for postsecondary education to select the examination so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory skills, the examination results accurately reflect the individual's aptitude or achievement level, or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired

sensory skills, except where those skills are the factors that the examination purports to measure. *See* 42 U.S.C. § 12189 & 28 C.F.R. § 36.309(b).

93.     Mr. Binno is an individual with a disability as that term is defined in the ADA. *See* 42 U.S.C. § 12102. He has an impairment that substantially limits him in the major life activity of seeing.

94.     Mr. Binno has a disability that impairs his sensory skills.

95.     LSAC offers an examination related to applications for postsecondary education.

96.     LSAC has selected an examination that, when administered to Mr. Binno, the examination results reflect his impaired sensory skills, rather than his aptitude or achievement level, or whatever other factor the examination purports to measure.

97.     LSAC has failed to select the examination to best ensure that, when the examination is administered to Mr. Binno, the examination results accurately reflect his aptitude or achievement level, or whatever other factor the examination purports to measure, rather than reflecting his impaired sensory skills.

98.     LSAC's acts in selecting the examination have harmed Mr. Binno by forcing him to take a discriminatory admission test and by erecting discriminatory barriers to his consideration for law school admission and scholarships.

99.     The harm to Mr. Binno is irreparable. Mr. Binno has no adequate remedy at law to prevent the continuing wrong and irreparable injury caused by LSAC's acts.

100.    The harm that Mr. Binno has suffered and continues to suffer is immediate.

## SECOND CLAIM FOR RELIEF

101.    Mr. Binno incorporates paragraphs 1-100 into this claim for relief.

102.    Title III of the ADA requires any person that offers an examination related to applications for postsecondary education to offer the examination in a manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals. *See* 42 U.S.C. § 12189 & 28 C.F.R. § 36.309(b).

103.    Modifications that are necessary to make an examination accessible to persons with disabilities are required, except where the person that offers the examination can demonstrate that the modifications would fundamentally alter the nature of the examination or result in an undue burden. *See* 28 C.F.R. § 36.309(b).

104.    Required modifications to make an examination accessible to persons with disabilities may include adaptation of the manner in which the examination is given. *See* 28 C.F.R. § 36.309(b)(3).

105.   Mr. Binno is an individual with a disability as that term is defined in the ADA. *See* 42 U.S.C. § 12102. He has an impairment that substantially limits him in the major life activity of seeing.

106.   LSAC offers an examination related to applications for postsecondary education.

107.   LSAC's examination is not offered in a manner accessible to Mr. Binno.

108.   LSAC has refused to adapt the manner in which the examination is given to make it accessible to Mr. Binno.

109.   Adapting the manner in which the examination is given by exempting Mr. Binno from the examination's Analytical Reasoning section would not fundamentally alter the nature of the examination or result in an undue burden to LSAC.

110.   LSAC's refusal to adapt the manner in which the examination is given has harmed Mr. Binno by forcing him to take a discriminatory admission test and by erecting discriminatory barriers to his consideration for law school admission and scholarships.

111.   The harm to Mr. Binno is irreparable. Mr. Binno has no adequate remedy at law to prevent the continuing wrong and irreparable injury caused by LSAC's acts.

112. The harm that Mr. Binno has suffered and continues to suffer is immediate.

**THIRD CLAIM FOR RELIEF**

113. Mr. Binno incorporates paragraphs 1 through 112 into this claim for relief.

114. Title V of the ADA makes it unlawful for any person to intentionally interfere with an individual in the exercise or enjoyment of any right protected by the ADA. *See* 42 U.S.C § 12203(b). Intent in this context includes deliberate indifference to an individual's exercise or enjoyment of rights protected by the ADA.

115. Rights protected by the ADA include the right of individuals with disabilities to be considered for law school admission and scholarships on a non-discriminatory basis.

116. Title II of the ADA prohibits public law schools from imposing or applying eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities, unless the criteria can be shown to be necessary. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(8). Title III of the ADA imposes the same restriction on private law schools. *See* 42 U.S.C. § 12182(b)(2)(A)(i).

117.   Mr. Binno is an individual with a disability as that term is defined in the ADA. *See* 42 U.S.C. § 12102. He has an impairment that substantially limits him in the major life activity of seeing.

118.   By refusing to exempt Mr. Binno from the LSAT's Analytical Reasoning section, LSAC has intentionally interfered with Mr. Binno's right to be considered for law school admission and scholarships on a non-discriminatory basis.

119.   LSAC's intentional interference with Mr. Binno's rights has harmed Mr. Binno by erecting discriminatory barriers to his consideration for law school admission and scholarships.

120.   The harm to Mr. Binno is irreparable. Mr. Binno has no adequate remedy at law to prevent the continuing wrong and irreparable injury caused by LSAC's acts.

121.   The harm that Mr. Binno has suffered and continues to suffer is immediate.

**FOURTH CLAIM FOR RELIEF**

122.   Mr. Binno incorporates paragraphs 1 through 121 into this claim for relief.

123.   Article 3 of the Michigan Persons with Disabilities Civil Rights Act ("PDCRA") prohibits any person from denying an individual the full and equal

enjoyment of the services, privileges, or advantages of a place of public accommodation because of a disability that is unrelated to the individual's ability to utilize and benefit from those services, privileges, or advantages. *See* M.C.L. § 37.1302.

124. The term "place of public accommodation" includes a business of any kind whose services, privileges, or advantages are extended, offered, sold, or otherwise made available to the public. *See* M.C.L. § 37.1301.

125. The PDCRA requires places of public accommodation to make reasonable accommodations for persons with disabilities, except where the place of public accommodation can demonstrate that making such accommodations would impose an undue hardship. *See* M.C.L. § 37.1102.

126. Mr. Binno is an individual with a disability as that term is defined in the PDCRA. *See* M.C.L § 37.1103.

127. LSAC is a place of public accommodation as that term is defined in Article 3 of the PDCRA. *See* M.C.L. § 37.1301.

128. LSAC has failed to make reasonable accommodations for Mr. Binno by refusing to exempt him from the LSAT's Analytical Reasoning section.

129. Exempting Mr. Binno from the LSAT's Analytical Reasoning section would not impose an undue hardship on LSAC.

130.    LSAC's failure to make reasonable accommodations for Mr. Binno has harmed Mr. Binno by forcing him to take a discriminatory admission test and by erecting discriminatory barriers to his consideration for law school admission and scholarships.

131.    The harm to Mr. Binno is irreparable. Mr. Binno has no adequate remedy at law to prevent the continuing wrong and irreparable injury caused by LSAC's acts.

132.    The harm that Mr. Binno has suffered and continues to suffer is immediate.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Binno requests that this Court:

(a)    Expedite this proceeding as provided for in 28 U.S.C. § 1657;

(b)    Declare that LSAC has violated Mr. Binno's rights under Titles III and V of the ADA and the PDCRA;

(c)    Enter a preliminary injunction, pending final resolution of this matter, ordering LSAC to exempt Mr. Binno from the LSAT's Analytical Reasoning section on the next conveniently available administration of the LSAT, and ordering LSAC to report Mr. Binno's raw score and percentile rank on each of the other scored sections of that test to law schools, and transmit his unscored writing sample to law schools in the same manner it does for all other test-takers;

(d)     Enter a permanent injunction ordering LSAC to exempt Mr. Binno and other similarly situated individuals from the LSAT's Analytical Reasoning section on future administrations of the LSAT, and ordering LSAC to report their raw score and percentile rank on all of the other scored sections of the tests to law schools, and transmit their unscored writing samples to law schools in the same manner it does for all other test-takers;

(e)     Award Mr. Binno reasonable attorneys' fees and costs of action; and

(f)     Grant such other and further relief as it may deem equitable, just, and proper.[2]

---

[2] Although Mr. Binno does not seek damages at this time, he reserves the right to seek leave to amend this Complaint to seek damages should that be necessary to motivate LSAC to comply with federal and state law.

Respectfully submitted,

/s/ David R. Moss
David R. Moss (P65977)
Wayne State University Law School,
    Civil Rights Clinic
471 West Palmer Street
Detroit, Michigan 48202
313-577-3970
david.moss@wayne.edu

/s/ Jonathon Akkari
Jonathon Akkari, Student Attorney[3]
Wayne State University Law School,
    Civil Rights Clinic
471 West Palmer Street
Detroit, Michigan 48202
313-577-4015
eh1220@wayne.edu

/s/ Matthew Makepeace
Matthew Makepeace, Student Attorney[4]
Wayne State University Law School,
    Civil Rights Clinic
471 West Palmer Street
Detroit, Michigan 48202
313-577-4015
matthewmakepeace@wayne.edu

Attorneys for Plaintiff
Dated:  May 16, 2017

/s/ Jason M. Turkish
Jason M. Turkish (P76310)
Nyman Turkish PC
20700 Civic Center Drive, Suite 115
Southfield, Michigan 48076
248-284-2480
jason.turkish@nymanturkish.com

/s/ Ryan T. Kaiser
Ryan T. Kaiser (P79419)
Nyman Turkish PC
20700 Civic Center Drive, Suite 115
Southfield, Michigan 48076
248-284-2480
ryan.kaiser@nymanturkish.com

---

[3] Practicing pursuant to Local Rule 83.21.
[4] Practicing pursuant to Local Rule 83.21.

# EXHIBIT A

# JUNE 2007 LSAT:
# ANALYTICAL REASONING SECTION

SECTION I

Time—35 minutes

23 Questions

<u>Directions:</u> Each group of questions in this section is based on a set of conditions. In answering some of the questions, it may be useful to draw a rough diagram. Choose the response that most accurately and completely answers each question and blacken the corresponding space on your answer sheet.

<u>Questions 1–5</u>

A company employee generates a series of five-digit product codes in accordance with the following rules:

The codes use the digits 0, 1, 2, 3, and 4, and no others.
Each digit occurs exactly once in any code.
The second digit has a value exactly twice that of the first digit.
The value of the third digit is less than the value of the fifth digit.

1. If the last digit of an acceptable product code is 1, it must be true that the

   (A) first digit is 2
   (B) second digit is 0
   (C) third digit is 3
   (D) fourth digit is 4
   (E) fourth digit is 0

2. Which one of the following must be true about any acceptable product code?

   (A) The digit 1 appears in some position before the digit 2.
   (B) The digit 1 appears in some position before the digit 3.
   (C) The digit 2 appears in some position before the digit 3.
   (D) The digit 3 appears in some position before the digit 0.
   (E) The digit 4 appears in some position before the digit 3.

3. If the third digit of an acceptable product code is not 0, which one of the following must be true?

   (A) The second digit of the product code is 2.
   (B) The third digit of the product code is 3.
   (C) The fourth digit of the product code is 0.
   (D) The fifth digit of the product code is 3.
   (E) The fifth digit of the product code is 1.

4. Any of the following pairs could be the third and fourth digits, respectively, of an acceptable product code, EXCEPT:

   (A) 0, 1
   (B) 0, 3
   (C) 1, 0
   (D) 3, 0
   (E) 3, 4

5. Which one of the following must be true about any acceptable product code?

   (A) There is exactly one digit between the digit 0 and the digit 1.
   (B) There is exactly one digit between the digit 1 and the digit 2.
   (C) There are at most two digits between the digit 1 and the digit 3.
   (D) There are at most two digits between the digit 2 and the digit 3.
   (E) There are at most two digits between the digit 2 and the digit 4.

GO ON TO THE NEXT PAGE.

Questions 6–10

Exactly three films—*Greed*, *Harvest*, and *Limelight*—are shown during a film club's festival held on Thursday, Friday, and Saturday. Each film is shown at least once during the festival but never more than once on a given day. On each day at least one film is shown. Films are shown one at a time. The following conditions apply:

On Thursday *Harvest* is shown, and no film is shown after it on that day.

On Friday either *Greed* or *Limelight*, but not both, is shown, and no film is shown after it on that day.

On Saturday either *Greed* or *Harvest*, but not both, is shown, and no film is shown after it on that day.

6. Which one of the following could be a complete and accurate description of the order in which the films are shown at the festival?

(A) Thursday: *Limelight*, then *Harvest*; Friday: *Limelight*; Saturday: *Harvest*

(B) Thursday: *Harvest*; Friday: *Greed*, then *Limelight*; Saturday: *Limelight*, then *Greed*

(C) Thursday: *Harvest*; Friday: *Limelight*; Saturday: *Limelight*, then *Greed*

(D) Thursday: *Greed*, then *Harvest*, then *Limelight*; Friday: *Limelight*; Saturday: *Greed*

(E) Thursday: *Greed*, then *Harvest*; Friday: *Limelight*, then *Harvest*; Saturday: *Harvest*

7. Which one of the following CANNOT be true?

(A) *Harvest* is the last film shown on each day of the festival.

(B) *Limelight* is shown on each day of the festival.

(C) *Greed* is shown second on each day of the festival.

(D) A different film is shown first on each day of the festival.

(E) A different film is shown last on each day of the festival.

8. If *Limelight* is never shown again during the festival once *Greed* is shown, then which one of the following is the maximum number of film showings that could occur during the festival?

(A) three
(B) four
(C) five
(D) six
(E) seven

9. If *Greed* is shown exactly three times, *Harvest* is shown exactly twice, and *Limelight* is shown exactly once, then which one of the following must be true?

(A) All three films are shown on Thursday.

(B) Exactly two films are shown on Saturday.

(C) *Limelight* and *Harvest* are both shown on Thursday.

(D) *Greed* is the only film shown on Saturday.

(E) *Harvest* and *Greed* are both shown on Friday.

10. If *Limelight* is shown exactly three times, *Harvest* is shown exactly twice, and *Greed* is shown exactly once, then which one of the following is a complete and accurate list of the films that could be the first film shown on Thursday?

(A) *Harvest*
(B) *Limelight*
(C) *Greed*, *Harvest*
(D) *Greed*, *Limelight*
(E) *Greed*, *Harvest*, *Limelight*

GO ON TO THE NEXT PAGE.

A cruise line is scheduling seven week-long voyages for the ship *Freedom*. Each voyage will occur in exactly one of the first seven weeks of the season: weeks 1 through 7. Each voyage will be to exactly one of four destinations: Guadeloupe, Jamaica, Martinique, or Trinidad. Each destination will be scheduled for at least one of the weeks. The following conditions apply to *Freedom*'s schedule:

Jamaica will not be its destination in week 4.
Trinidad will be its destination in week 7.
*Freedom* will make exactly two voyages to Martinique, and at least one voyage to Guadeloupe will occur in some week between those two voyages.
Guadeloupe will be its destination in the week preceding any voyage it makes to Jamaica.
No destination will be scheduled for consecutive weeks.

11. Which one of the following is an acceptable schedule of destinations for *Freedom*, in order from week 1 through week 7?

   (A)   Guadeloupe, Jamaica, Martinique, Trinidad, Guadeloupe, Martinique, Trinidad
   (B)   Guadeloupe, Martinique, Trinidad, Martinique, Guadeloupe, Jamaica, Trinidad
   (C)   Jamaica, Martinique, Guadeloupe, Martinique, Guadeloupe, Jamaica, Trinidad
   (D)   Martinique, Trinidad, Guadeloupe, Jamaica, Martinique, Guadeloupe, Trinidad
   (E)   Martinique, Trinidad, Guadeloupe, Trinidad, Guadeloupe, Jamaica, Martinique

12. Which one of the following CANNOT be true about *Freedom*'s schedule of voyages?

   (A)   *Freedom* makes a voyage to Trinidad in week 6.
   (B)   *Freedom* makes a voyage to Martinique in week 5.
   (C)   *Freedom* makes a voyage to Jamaica in week 6.
   (D)   *Freedom* makes a voyage to Jamaica in week 3.
   (E)   *Freedom* makes a voyage to Guadeloupe in week 3.

13. If *Freedom* makes a voyage to Trinidad in week 5, which one of the following could be true?

   (A)   *Freedom* makes a voyage to Trinidad in week 1.
   (B)   *Freedom* makes a voyage to Martinique in week 2.
   (C)   *Freedom* makes a voyage to Guadeloupe in week 3.
   (D)   *Freedom* makes a voyage to Martinique in week 4.
   (E)   *Freedom* makes a voyage to Jamaica in week 6.

14. If *Freedom* makes a voyage to Guadeloupe in week 1 and a voyage to Jamaica in week 5, which one of the following must be true?

   (A)   *Freedom* makes a voyage to Jamaica in week 2.
   (B)   *Freedom* makes a voyage to Trinidad in week 2.
   (C)   *Freedom* makes a voyage to Martinique in week 3.
   (D)   *Freedom* makes a voyage to Guadeloupe in week 6.
   (E)   *Freedom* makes a voyage to Martinique in week 6.

15. If *Freedom* makes a voyage to Guadeloupe in week 1 and to Trinidad in week 2, which one of the following must be true?

   (A)   *Freedom* makes a voyage to Martinique in week 3.
   (B)   *Freedom* makes a voyage to Martinique in week 4.
   (C)   *Freedom* makes a voyage to Martinique in week 5.
   (D)   *Freedom* makes a voyage to Guadeloupe in week 3.
   (E)   *Freedom* makes a voyage to Guadeloupe in week 5.

16. If *Freedom* makes a voyage to Martinique in week 3, which one of the following could be an accurate list of *Freedom*'s destinations in week 4 and week 5, respectively?

   (A)   Guadeloupe, Trinidad
   (B)   Jamaica, Guadeloupe
   (C)   Martinique, Trinidad
   (D)   Trinidad, Jamaica
   (E)   Trinidad, Martinique

17. Which one of the following must be true about *Freedom*'s schedule of voyages?

   (A)   *Freedom* makes a voyage to Guadeloupe either in week 1 or else in week 2.
   (B)   *Freedom* makes a voyage to Martinique either in week 2 or else in week 3.
   (C)   *Freedom* makes at most two voyages to Guadeloupe.
   (D)   *Freedom* makes at most two voyages to Jamaica.
   (E)   *Freedom* makes at most two voyages to Trinidad.

GO ON TO THE NEXT PAGE.

Questions 18–23

There are exactly three recycling centers in Rivertown:
Center 1, Center 2, and Center 3. Exactly five kinds of
material are recycled at these recycling centers: glass,
newsprint, plastic, tin, and wood. Each recycling center
recycles at least two but no more than three of these kinds of
material. The following conditions must hold:

   Any recycling center that recycles wood also recycles
   newsprint.
   Every kind of material that Center 2 recycles is also
   recycled at Center 1.
   Only one of the recycling centers recycles plastic, and that
   recycling center does not recycle glass.

18.  Which one of the following could be an accurate account
     of all the kinds of material recycled at each recycling
     center in Rivertown?

     (A)    Center 1: newsprint, plastic, wood; Center 2:
            newsprint, wood; Center 3: glass, tin, wood
     (B)    Center 1: glass, newsprint, tin; Center 2: glass,
            newsprint, tin; Center 3: newsprint, plastic,
            wood
     (C)    Center 1: glass, newsprint, wood; Center 2: glass,
            newsprint, tin; Center 3: plastic, tin
     (D)    Center 1: glass, plastic, tin; Center 2: glass, tin;
            Center 3: newsprint, wood
     (E)    Center 1: newsprint, plastic, wood; Center 2:
            newsprint, plastic, wood; Center 3: glass,
            newsprint, tin

19.  Which one of the following is a complete and accurate
     list of the recycling centers in Rivertown any one of
     which could recycle plastic?

     (A)    Center 1 only
     (B)    Center 3 only
     (C)    Center 1, Center 2
     (D)    Center 1, Center 3
     (E)    Center 1, Center 2, Center 3

20.  If Center 2 recycles three kinds of material, then which
     one of the following kinds of material must Center 3
     recycle?

     (A)    glass
     (B)    newsprint
     (C)    plastic
     (D)    tin
     (E)    wood

21.  If each recycling center in Rivertown recycles exactly
     three kinds of material, then which one of the following
     could be true?

     (A)    Only Center 2 recycles glass.
     (B)    Only Center 3 recycles newsprint.
     (C)    Only Center 1 recycles plastic.
     (D)    Only Center 3 recycles tin.
     (E)    Only Center 1 recycles wood.

22.  If Center 3 recycles glass, then which one of the
     following kinds of material must Center 2 recycle?

     (A)    glass
     (B)    newsprint
     (C)    plastic
     (D)    tin
     (E)    wood

23.  If Center 1 is the only recycling center that recycles
     wood, then which one of the following could be a
     complete and accurate list of the kinds of material that
     one of the recycling centers recycles?

     (A)    plastic, tin
     (B)    newsprint, wood
     (C)    newsprint, tin
     (D)    glass, wood
     (E)    glass, tin

# S T O P

IF YOU FINISH BEFORE TIME IS CALLED, YOU MAY CHECK YOUR WORK ON THIS SECTION ONLY.
DO NOT WORK ON ANY OTHER SECTION IN THE TEST.

# EXHIBIT B

# LSAC LETTER TO RICHARD H. BERNSTEIN, MAY 25, 1995

**LAW**
Services

**Law School Admission Services**     Box 2000T
Newtown, PA 18940-0995

May 25, 1995

Test Administration Group                                          215.968.1001
                                                                   FAX 215.968.1277

Richard H. Bernstein
3256 Bloomfield Shore Drive
West Bloomfield, MI 48323

Dear Mr. Bernstein:

Your request for additional test time for the June 12, 1995
LSAT has been forwarded to me for response.

Due to the amount of additional test time you are requesting,
it may be more beneficial for you to request that the law
schools waive the LSAT test requirement.

To request that the law schools waive the LSAT requirement,
you shoul refer to the procedures covered in the paragraph on
page 11 of the 1995-96 LSAT/LSDAS Registration and Information
Book concerning the waiving of the LSAT requirement.

Since accommodated conditions have not been established for
the June 12, 1995 LSAT, you will be refunded $79.00 for the
LSAT registration fee. Please allow approximately two weeks
for receipt of your refund check.

If you have any questions concerning the above, please do not
hesitate to contact Law Services at (215)968-1001.

Sincerely,

Tom Ruck
Manager, Test Administration